## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION



CHARLES ROACH AND ANNA ROACH, §
§
*Plaintiffs*, §      CIVIL ACTION No. 3:23-cv-309 KHJ- MTP
§
v. §
§
ALLSTATE PROPERTY AND CASUALTY §
INSURANCE COMPANY, §
§
*Defendant*. §

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

MAY 17 2022

ARTHUR JOHNSTON
BY_____ DEPUTY

### PLAINTIFFS' ORIGINAL COMPLAINT

#### PARTIES

1.    Plaintiffs, Charles Roach and Anna Roach (collectively referred to as "Plaintiff,") are individuals and residents of the State of Mississippi.

2.    Defendant, Allstate Property and Casualty Insurance Company, is a corporation that is incorporated under the laws of the State of Illinois. Defendant has its principal place of business in the State of Illinois. Defendant may be served with process by serving its registered agent, C T Corporation System of Mississippi, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

#### JURISDICTION

3.    The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because plaintiff and defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

#### VENUE

4.    Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

**CONDITIONS PRECEDENT**

5.    All conditions precedent has been performed or have occurred.

**FACTS**

6.    At all times relevant to this lawsuit, Allstate's actions taken, and decisions made in its handling of plaintiff's insurance claim were predetermined by, directed by, and mandated by the directives of Allstate's claims handling program designed by McKinsey and Company. Allstate handled plaintiff's claim in a manner calculated to conform with Allstate's profit objectives, rather than in a manner that complied with sound underwriting and insurance principles that would to a proper adjustment of plaintiff's claim and a reasonable profit for Allstate. Allstate then used its financial leverage and aggressive litigation system to discourage plaintiff from challenging plaintiff's claim and to put pressure on plaintiff and her attorney to accept Allstate's deficient claim payment. These described claim handling procedures, policies and goals are expressly outlined in documents created by McKinsey and Company at the behest of Allstate.

7.    Plaintiff is the owner of homeowner insurance policy number 000985043930, which was issued by Allstate (hereinafter referred to as the "policy").

8.    Plaintiff owns the insured property that is specifically located at 5865 Jackson Raymond Road, Raymond, Mississippi 39154 (hereinafter referred to as the "property").

9.    Defendant or its agent sold the policy insuring the property to plaintiff.

10.    On or about June 6, 2020, plaintiff's property sustained wind and hail damage. Plaintiff submitted a claim to Allstate against the policy for the damage.

11.    Plaintiff submitted a claim to Allstate against the policy for damage caused to the property because of the wind and hail. The insured asked Allstate to cover the cost of repairs to

the property pursuant to the policy and any other available coverages under the policy. Allstate assigned claim number 0608216981 to the insured's claim.

12.    On or about May 6, 2021, Craig Porter inspected the property in question on Allstate's behalf. The storm caused significant damage to the roof, exterior, and interior of the dwelling.

13.    Allstate's unreasonable investigation of the claim included a failure to comply with Allstate's policies and procedures concerning roof inspections and when to replace or repair a roof. The storm caused significant damage to the roof, including loss of granules to the shingles. Wind damage uplifted and removed shingles, which would not allow the shingles to reseal to prevent water intrusion. The wind lifted and loosened the nails that previously fastened the shingles to the sheathing. Water penetrated the newly created openings and damaged the plywood sheathing. The roof required full replacement under Allstate's policies and procedures including repairs to the roof jack, drip edge, and other structural parts of the roof. Allstate performed an unreasonable investigation by failing to document all the damage to the roof. Allstate did not conduct a thorough roof inspection and did not allow the cost to remove and replace the roof. As a result of Allstate's unreasonable and brief investigation, the insured was wrongly denied the full cost to replace the roof.

14.    Porter performed an insufficient and unreasonable interior investigation of the property. Water intrusion from the roof caused extensive damage to the bathrooms and living room. The extensive damage to the interior of the property called for the drywall to be sealed, hung, taped, and floated, removal and replacement of insulation, repair to the texture, painting, and contents removal. As a result of Allstate's unreasonable investigation, the insured was wrongly denied the full cost to repair all the interior damage.

15. Allstate failed to document the damage to the dwelling roof and interior. Allstate conducted an insufficient inspection and prematurely closed the insured's claim. At the time of the investigation, premature closing of claims was part of a pattern and practice of claims handling by Allstate.

16. Allstate failed to properly adjust the claim and Allstate has denied at least a portion of the claim without an adequate investigation, even though the policy provided coverage for losses such as those suffered by the insured. Furthermore, Allstate underpaid portions of the insured's claims by not providing full coverage for the damages sustained by the insured, as well as under-scoping the damages during its investigation.

17. Allstate failed to properly qualify, train, and supervise its employees and agents to whom Allstate entrusted the handling of various portions of insured's claim. Allstate, its agents, and employees failed to follow procedures and properly execute their duties as promulgated in Allstate's system of administering and handling the insured's claim. Allstate's actions, as detailed in the facts of this letter and the allegations set forth below, caused a system failure that resulted in Allstate's denial to the insured of the full protection and the laws of Mississippi and the the policy benefits to which the insured was entitled.

18. To date, Allstate continues to delay in the payment for the damages to the property. As such, the insureds' claim(s) remain unpaid, and the insured still has not been able to properly repair the property.

### ALLSTATE'S USE OF LITIGATION

19. "When an insured buys insurance, she buys insurance – not a lot of vexatious, time-consuming, expensive litigation with her insurer." As stated previously, insurance companies account for future claim payouts, claim expenses, and a reasonable profit in setting premium rates

for their books of business. However, insurance companies have hired consulting companies, such as McKinsey & Company, to implement plans, strategies, policies, and processes to transform insurance companies' claim departments into profit centers. McKinsey & Company is the most powerful consulting company in the world and has "the greatest global reach of any advisor to management in the world." It serves as the chief advisor and key architect of strategic thinking for "147 of the world's 200 largest corporations, including 80 of the top 120 financial-services firms, 9 of the 11 largest chemical companies, and 15 of the 22 biggest health-care and pharmaceutical concerns." McKinsey's clients pay from $10 million to $60 million per year for advice on how to manage their business operations to increase profitability. McKinsey & Company acted as a leader in formulating a new insurance strategy to convert insurance claim departments into efficient profit centers. Many of the world's largest insurers hired McKinsey for this purpose. However, although every insurance company did not hire McKinsey directly and did not have a direct relationship with McKinsey, McKinsey's policies influenced the operations of the insurance industry as a whole because of the extraordinary results McKinsey achieved for the insurance companies that did retain McKinsey directly for its consulting services. By 1992, McKinsey had already worked on a number of projects for insurance companies seeking to increase profits. These included State Farm, Hartford, United Services Automobile Association (USAA), and possibly Nationwide, and Liberty Mutual as well. During the mid-1980's, USAA invited interested members of the insurance community to its home office in San Antonio for open discussions about McKinsey's redesign of its claim system. USAA credited McKinsey with "saving" the company and openly shared information about McKinsey's creation of USAA's new claims handling system.

20.    In essence, the McKinsey strategy calls for Allstate to take measures to reach various goals as part of its design to convert the insurance claims handling department into an efficient profit center.  A major goal of this strategy is to shift any advantage away from the insureds and plaintiffs' attorneys.  As the first step in the process, insurers reduce attorney representation levels by improving the initial customer service experience for its insureds.  Specifically, insurers make early contact with the insureds following a claim, promises fair treatment, and promises prompt payment.  During the claim investigation, insurers aggressively investigate only the facts which defeat the claim once attorney representation begins.  Insurers then make "firm" [take-it-or-leave-it] settlement offers with no real negotiation.  If the insured refuses to accept the "firm" offer, then the insurance company aggressively litigates the claim to verdict without negotiation or compromise, employing hard-nosed tactics designed to make litigation so lengthy and expensive that policyholders and attorneys will yield to the insurer's claim values.  Essentially, policyholders who want "prompt" payment – meaning they are willing to give the insurance company a cut from their share of the claim trust fund – get "Good Hands" treatment; while policyholders who want "fair" payment – meaning they refuse to give the insurance company a cut from their share of the claim trust fund – get "Boxing Gloves" treatment.  No policyholder, however, will get both prompt *and* fair payment of a claim.

21.    Allstate implemented a litigation management system designed to enforce policyholder acceptance of its new claim system.  Under traditional casualty insurance thinking, insurers were naturally disposed to avoiding litigation whenever possible, because litigation tended to defeat the goals of the fiduciary/indemnity paradigm.  Allstate sees litigation as providing the best possible venue for achieving the goals of its new system for casualty insurance.   Litigation is costly and time consuming. It allows an insurer to fully exploit its overwhelming financial superiority and

the policyholder's vulnerability to delay, which is the natural consequence of the casualty loss. Litigation would also provide a means for Allstate to send messages to other policyholders and plaintiff's attorneys about the futility of resistance to the new system.

22. In addition to these company-level procedures, Allstate implemented an insurance company strategy that focused on societal, legislative, and commercial measures which all but ensured the success of the strategy. Allstate implemented a plan for insurance companies to lead national campaigns to attempt to change public policy, abolish or reduce the effectiveness of bad faith statutes, and judicially repeal the common law fiduciary/indemnity paradigm which made it bad faith for casualty insurers to use increased shareholder value or increased claim surpluses as the only legitimate goals of claim handling.

23. Defendant's claim handling protocols, company goals, profit goals and claim handling strategy originates from the doctrine that was created, implemented, and shared with the insurance community by McKinsey. Defendant's protocols, strategies, and procedures for handling homeowner insurance claims are closely aligned with and virtually matches the claims handling system created by McKinsey. In the case at hand, Allstate implemented McKinsey's claim handling system to wrongly deny plaintiff's claim and to increase Allstate's profits at plaintiff's expense.

### INFORMATION LIKELY TO BE IN THE POSSESSION OF ALLSTATE

24. Allstate initiated a program in the mid-1990's called "Claims Core Process Redesign," or CCPR. Allstate was assisted in the implementation of CCPR by McKinsey & Company. The purpose of the CCPR program was nothing less than to transform Allstate into the most profitable claim service in the industry. The CCPR program achieved this goal by artificially reducing claim payments. CCPR was the result of a closed file survey conducted by Allstate personnel rather than

independent auditors. These closed file surveys purported to identify which claims were overpaid. The closed file survey included a flaw as it did not utilize an established metric for the underpayment of claims. The true motive behind the closed file survey was to identify ways to artificially lower claim payouts in a manner detrimental to Allstate's first- and third-party claimants. In the case at hand, Allstate employed CCPR principles to its handling of plaintiff's claim in a manner that maximized shareholder profits and compromised the fair handling of plaintiff's claim.

25. Allstate ensured its employees would assist in the implementation of CCPR by creating incentive programs for claim adjusters and management to reduce average claim payouts, regardless of merit. Allstate's incentive programs were known as Quarterly Performance Reviews (QPR) or Planning, Performance, and Review (PP&R). These artificial goals had, and continue to have, no rational relationship to the actual value of any individual claim, including the plaintiff's claim in this case.

26. One of the ways in which Allstate achieved lowered claim payments was to adopt an aggressive strategy towards wind claims. Following wind and hail claims, Allstate implements a policy of standard denial, which requires insurance adjusters to initially deny policyholder claims as a means of gauging the policyholder's willingness to haggle with the insurance company. If the policyholder accepts the denial, then Allstate retains all the money owed to the policyholder. In essence, Allstate eliminates claims by issuing sweeping denials under the presumption that some policyholders will accept the denial without question. Policyholders who refuse to accept the denial and choose to pursue their claim through litigation, however, face "mad dog defense tactics" that frustrate policyholders' ability to pursue their claims. In addition, because litigating insurance bad faith claims has become so expensive and time consuming, policyholders and attorneys are

becoming increasingly unwilling to fight insurance companies. Thus, Allstate not only frustrates policyholders' attempts to pursue their claim, but Allstate also sends a message to plaintiff's attorneys that filing suit against Allstate does not constitute an economically viable option. As a result, lawyers who routinely represent plaintiffs in first-party insurance homeowner insurance claims will refuse to represent plaintiffs who have claims against Allstate.

27.    Allstate also routinely withholds "overhead and profit" as part of its scheme to achieve lowered claim payments. "Overhead and profit" is a benefit available to policyholders that provides an additional twenty percent above the amount of the claim to pay for a general contractor to coordinate repairs. Insurance companies have an obligation to include overhead and profit in the actual cash value payment. Allstate conceals and fails to disclose the availability of the overhead and profit benefit to policyholders. In this case, Allstate wrongfully denied coverage for plaintiff's claim for overhead and profit.

28.    Allstate also creates an environment that encourages independent adjusters to underpay claims. By tracking the average amount paid on claims for each adjuster, Allstate can determine which adjusters are keeping costs down. Allstate therefore rewards independent adjusters by giving them additional business in exchange for minimizing Allstate's indemnity payout on claims. This arrangement creates a conflict of interest between the independent adjusters and the policyholders and allows the policyholders to detrimentally rely on the independent adjusters' determinations without knowledge of the conflict of interest. In this case, Allstate assigned an inadequately trained adjuster to inspect plaintiff's property and adjust plaintiff's claim. In addition, the adjuster had an Allstate-provided financial incentive to deny all or part of plaintiff's claim.

29.    Through implementation of CCPR, Allstate develops incentives, such as promotions for keeping costs down, that results in policyholders being paid less than they are owed. CCPR creates pressure for profit-making that manifests itself in underpayment of claims. Allstate had actual awareness that CCPR would result in underpaying plaintiff's claim. Allstate employs a nationwide scheme to cheat policyholders out of money to which the policyholders are entitled. Allstate has employed the principles and techniques of CCPR against plaintiff in this case in a deceptive, fraudulent, oppressive, and malicious manner. In this case, Allstate provided its managers, adjusters and employees who handled plaintiff's claim with a financial incentive to deny all or part of plaintiff's claim.

30.    After Allstate implemented CCPR in 1995, Allstate's surplus, or "the excess of an insurance company's assets above its legal liabilities" skyrocketed from $6.5 billion in 1994 to $16.8 billion in 2004, a total increase of $10.2 billion – an average yearly increase in surplus of about $1 billion per year. By comparison, between 1986 and 1994—the years immediately before CCPR was implement—Allstate's surplus increased by a *total* of $2.5 billion—for an average increase of only $272 million per year. To put this further into perspective, it took Allstate sixty-three (63) years to build up its 1994 surplus of $6.5 billion. After implementing CCPR, Allstate nearly tripled its surplus in only ten (10) years. Allstate's stockholder dividends have steadily risen every year since CCPR was implemented, almost tripling from thirty-nine cents ($0.39) per share in 1995 to one dollar and twelve cents ($1.12) per share in 2004. Remarkably, these increases in surplus also occurred despite an unprecedented string of natural disasters, including numerous devastating hurricanes in the Southeast and a major California earthquake. These increases are more remarkable because they also occurred after the payment of dividends to Allstate

shareholders amounting to approximately $18 billion since 1996, according to financial presentations made by Allstate senior executives to the investment community in 2006.

31.    Another component of CCPR focused on the rate at which claimants were represented by legal counsel. Allstate's CCPR manual directed claim representatives to "realize that the way we approach claimants and develop relationships will significantly alter representation rates and contribute to lower severities." The manual explained that "payment on represented claims is on average five times the size of unrepresented claims." Consequently, Allstate instructed its claim personnel to eliminate or reduce the likelihood that a claimant would hire an attorney.

32.    By dissuading claimants from seeking legal counsel, Allstate was able to prey upon unrepresented claimants' trust and lack of knowledge and to deny or settle claims for a fraction of their value. If a settlement offer was not accepted or the claimant hired an attorney, Allstate would fully litigate virtually every claim, irrespective of the value of the injuries suffered by the claimant. Allstate thereby sought to subject claimants to unnecessary and oppressive litigation and expenses, or in other words, "scorched-earth litigation tactics." In the case at hand, Allstate wrongfully denied all or a portion of plaintiff's claim with the expectation that plaintiff would not hire an attorney.

33.    Allstate instructed its claim representatives to meet with the claimants' attorneys to emphasize those costs" *i.e.*, "attorney economics" – through threats, intimidation, and strong-arm tactics. Allstate carried out its policies through the active participation of its attorneys. The "Litigation Management" section of the CCPR manual segmented, or targeted, certain claims for litigation and trial. One such litigation segment was referred to as "Settle for 'X' or less – default to trial." Allstate's attorneys were required to "increase trial activity in appropriate cases," such as "where settlement could not be reached for the evaluated amount." The reason that Allstate's

attorneys were expected to have "more trials" was to "reduce loss payout." Allstate used incentive compensation programs to encourage its attorneys to try more cases, irrespective of whether such litigation was justified by the facts. In the case at hand, Allstate denied plaintiff's claim as part of its scheme to use litigation costs and "attorney economics" to dissuade plaintiff and any attorney plaintiff would hire from challenging Allstate's claim decision.

34.    Any resulting decrease in claim payments did not serve as a reflection of the true value of the defended claims. Allstate's research indicated that claimants' attorneys who brought cases to trial obtained favorable results. Allstate determined, expressly and as a matter of corporate claims handling policy, that litigating claims "appear to lead to better results than negotiating with plaintiff attorneys." Nevertheless, because of Allstate's scorched-earth litigation tactics and the message Allstate sends to attorneys regarding Allstate's proactive claim defense stance, Allstate correctly predicted that substantially fewer claimant attorneys would bring those insureds' claims to trial. Hence, Allstate would receive a net decrease in claim payouts.

35.    Allstate applied the claim handling principles of CCPR across all insurance coverage lines. Specifically, Allstate specifically implemented a version of CCPR to govern its handling of homeowner insurance claims.

36.    Allstate handled plaintiff's claim under the construct, policies, procedures, and goals of the CCPR program created by McKinsey & Company and implemented by Allstate.

## ALLSTATE'S CLOSED FILE SURVEY

37.    Prior to Allstate's implementation of Homeowner CCPR, McKinsey & Company conducted a preliminary "Closed File Survey" of eleven (11) Market Claims Offices ("MCO's"). Before initiating the survey, McKinsey began with the presumption that Allstate's claim process exhibited "leakage," or the overpayment of policyholder claims. It is worth noting that the

McKinsey slides provide no proof or support for this critical assumption. Subsequently, Allstate's senior executives became somewhat uncomfortable with McKinsey's term "leakage," and began to substitute the oxymoronic phrase "fair value" or "fair payment."

38.    McKinsey then segmented claims into homogenous groups based on type of coverage, type of damage, and attorney involvement. Using this segmentation procedure to organize the claim processes that would make up the homeowner portion of CCPR, McKinsey classified claims into groups based on common characteristics, which presented the best opportunity for reducing claim payments. McKinsey determined that the evaluation of wind and fire claims presented the largest opportunity for reduced claim payouts. McKinsey's closed file survey indicated that "overpayments" occurred in the adjustment of claims when adjusters evaluated claims based on their professional claim experience according to the individual merits of each claim.

39.    While building CCPR, Allstate and McKinsey started with profit goals and then built a claim evaluation system aimed at achieving those goals. Specifically, McKinsey built Allstate's claim evaluation system around Colossus. Colossus allowed Allstate to calibrate or "tune" the software program by inputting predetermined claim values which Allstate's adjusters could incorporate into their actual claim evaluations. In other words, Allstate would predetermine the value of certain claims and then charge its adjusters with matching those values in their actual claim evaluations. In determining the preset values, Allstate used figures that aligned with its profit goals rather than using evaluations from independent, real world professionals. Rather than using real and current market values in its "tuning" of Colossus, Allstate entered its own figures and used those evaluations to set a "new and reduced market value for claims." Allstate used Colossus in its CCPR evaluation of bodily injury claims. It is the market's role – not Allstate's

role - to set market values for claims, and Allstate committed bad faith in attempting to artificially set claim market values and apply those values to plaintiff's claim.

40.    The McKinsey slides are the construction plans for Allstate's "claim payment factory." They show how McKinsey designed Allstate's claim handling system to underpay homeowner and other insurance claims.  They show how McKinsey designed Allstate's claim factory to produce an inherently defective product that fails to provide insureds with prompt and fair indemnification for their covered losses, thereby endangering our standard of living.  Allstate evaluated the plaintiff's claim using this system and denied the plaintiff's claim for reasons unrelated to the merits of the claim.

41.    Allstate knew that its implementation of CCPR would create a significant risk of liability for bad faith claims and punitive damages.  Nevertheless, Allstate analyzed CCPR for "balance of risk and reward" and concluded that CCPR's rewards would justify any risk.  In other words, even if Courts and juries imposed bad faith penalties on the minimal amount of cases that proceeded to trial, CCPR would still produce the intended profits because plaintiffs' lawyers would overall be reluctant to litigate and take enough cases to trial.  Remember, Allstate devoted a substantial portion of CCPR to sending a message to plaintiffs' attorneys regarding "attorney economics" and the fact that Allstate would vigorously defend claims without regard to the merits of those claims.

42.    The goals, processes, and procedures of the CCPR program have been absorbed into Allstate's overall way of doing business.  Allstate never stopped using CCPR in its handling of insurance claims.  Allstate never hired McKinsey or another consulting firm to take on the monumental task of teaching a different claims handling system to its employees, instilling a new claim handling culture, or ensuring the elimination of CCPR from Allstate's claim handling culture, goals, and procedures.  The goals, processes, and procedures left over from the CCPR

program have been used to deny the plaintiff's claim in a deceptive, fraudulent, oppressive, and malicious manner. In the case at hand, Allstate employed its CCPR-based claim system in its handling of plaintiff's claim. In doing so, Allstate denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns. To date, Allstate continues to delay in the payment for the damages to the property. As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## POST-CLAIM UNDERWRITING

43.    Plaintiff alleges that Allstate engaged in fraudulent post-claim underwriting. At the time that defendant sold the insurance policy to plaintiff, defendant had no intention of performing its duties and honoring the representations it made to plaintiff. Specially, this representation consisted of defendant's promise to provide full indemnity to plaintiff from financial loss caused by a covered peril, less the policy deductible. Allstate intentionally under-evaluated the risk associated with the insurance policy to secure the policy sale and made an attempt to properly evaluate the risk only after plaintiff filed the insurance claim at issue.  In its use of post-claim underwriting, defendant searched for reasons to deny plaintiff's claim by conducting the type of evaluation that it should have conducted before defendant sold the policy to plaintiff and before plaintiff paid insurance premiums to defendant. Had plaintiff known and understood that defendant would engage in post-claim underwriting before plaintiff agreed to purchase the insurance policy from defendant, the plaintiff could have made an informed decision and purchased coverage from a different insurance company. Defendant's actions allowed defendant to collect an upfront premium profit while intending to betray its promise of full indemnity. In the case at hand, defendant's fraudulent post-claim underwriting scheme caused plaintiff to purchase a worthless insurance policy and suffer financial property loss.

44. Allstate denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns. To date, Allstate continues to delay in the payment for the damages to the property. As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## COUNT 1 - BAD FAITH

45. Plaintiff is insured under an insurance contract issued by Allstate, which gave rise to a duty of good faith and fair dealing.

46. Defendant breached the duty by denying and delaying payment of a covered claim when defendant knew or should have known its liability under the policy was reasonably clear.

47. Defendant also breached the duty by creating and applying a claim handling system that was designed to ensure that the plaintiff's claim was denied without consideration of the merits of the claim.

48. Following its initial inspection, Allstate possessed all information necessary to enable it to make a fair coverage and payment determination on plaintiff's claim. In addition, following its initial inspection, Allstate failed to provide coverage for all the covered damage, including the damage that plaintiff's inspector discovered during his inspection. Although Allstate designed its claims investigation system in a manner that would ensure timely claim payments, reasonable property inspections, and thorough property inspections, Allstate failed to honor its obligation to perform a reasonable investigation and issue timely payment to plaintiff.

49. Defendant's breach of duty proximately caused injury to plaintiff, which resulted in the following damages:

      a.    mental anguish damages; and

      b.    loss of policy benefits.

50.    <u>Exemplary damages.</u> Plaintiff suffered injury independent of the loss of policy benefits, and that injury resulted from defendant's gross negligence, malice, or actual fraud, which entitles plaintiff to punitive damages.

## COUNT 2 - BREACH OF CONTRACT

51.    In addition to other counts, Allstate breached its contract with plaintiff.

52.    Plaintiff and defendant executed a valid and enforceable insurance contract. The contract stated that defendant would pay the replacement cost of all damage which occurred to plaintiff's property caused by a covered peril, and that plaintiff would pay insurance premiums and perform other obligations as outlined in the insurance policy.

53.    Plaintiff fully performed plaintiff's contractual obligations.

54.    Allstate breached the contract by refusing to pay the full amount of the cost to repair or replace the property. Allstate failed and refused to pay any of the proceeds of the policy, although due demand was made for proceeds to be paid in an amount sufficient to cover the damaged property and all conditions precedent to recovery upon the policy had been carried out and accomplished by plaintiff.

55.    Plaintiff seeks unliquidated damages within the jurisdictional limits of this court.

## COUNT 3 – COMMON LAW FRAUD

56.    Underwriting is not only a part of insurance; underwriting *is* insurance. Underwriting is the function of securing and evaluating information and making decisions to accept or reject risks. The insurance underwriting and claims processes are inextricably linked. When a loss occurs, the policyholder's payment of that loss has already been collected during the underwriting process. Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in rates. If the underwriters accept risks that experience

more losses than anticipated, the rates will be inadequate, and the insurer's solvency might be threatened.

57.    Before an insurer sells an insurance policy to a customer, the insurance company underwrites the property to be insured.  When an insurer underwrites a new policy, it records a premium receivable (which is an asset) and a claim obligation (which is a liability).  Hence, the claim handling process begins when the insurance company sells the insurance policy to the insured – not when the anticipated loss occurs. The liability is considered part of the unpaid losses account, which represents the loss reserve.  Maintaining an adequate level of loss reserves puts an insurance company in a better financial position to pay out claims.

58.    Thus, the insurer reserves money to pay a claim in advance of the claim occurrence and during the policy underwriting process.  Specifically, in calculating the premium, the insurance company performs a set of calculations.  First, the insurance company determines the "loss costs.", which make up the primary block of the insurance premium.  Loss costs are the insurer's good faith projection of how much it will pay for claims that arise under the policy during a given policy period.  Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers."  Generally, loss costs make up generally about seventy cents ($0.70) of every premium dollar an insured pays for property-casualty coverages.

59.    To correctly underwrite any risk and thus properly calculate the loss costs, the insurance company underwriters must secure information about the risk.  Every discussion about the underwriting decision to be made on an insurance application must be based on facts that have been secured. One of the major reasons for securing information about each risk concerns the insurance company's avoidance of adverse selection in underwriting a policy.  Adverse selection refers to situations in which an insurance company extends coverage to an applicant whose actual

risk is substantially higher than the risk known by the insurance company. To minimize the risk of adverse selection, the insurance company must obtain information regarding the physical condition of the buildings it contemplates insuring. Thus, property inspections are critical in the underwriting workflow. These inspections are often used to verify the insured not only exists at the address on the policy and there are no liability or other hazards that exist on the property that could cause the property owner and/or the insurance company unnecessary exposure. These inspections are used as an underwriting tool to minimize the potential of an insurance claim and to verify that the information collected at the time of application for the policy is correct. Allstate failed to conduct an underwriting inspection and failed to property underwrite the insurance policy.

60. Allstate could not provide its insurance services unless it was able to make a legitimate profit sufficient to allow it to remain solvent and provide a reasonable return to its shareholders. The premium that Allstate required plaintiff to pay for the insurance policy was calculated to allow Allstate to accomplish those goals.

61. Allstate charges its policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period. Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for Allstate's profit. In addition, Allstate's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.

62. Allstate made the material representation to plaintiff that Allstate would pay the full cost of casualty losses, less the policy deductible, that plaintiff suffered in a covered event. This

representation was false. When Allstate made this representation, Allstate knew that Allstate had not underwritten the policy correctly. The McKinsey program dictated that Allstate focus on marketing, collecting premiums, and building a litigation program to vigorously fight policyholders who attempted to challenge Allstate's claim decisions. Allstate did not underwrite the policy with the intent of paying the full value of future claims. Just the opposite – Allstate underwrote the policy knowing that the McKinsey claim handling system would enable it to enforce its predetermined claim values without regard to the true value of a policyholder claim. In other words, because Allstate's McKinsey program predetermined policyholder claim values, it was unnecessary for Allstate's actuaries to predict the value of future claims through the underwriting process.

63.    When Allstate sold plaintiff the insurance policy, Allstate promised to pay the full value of future covered claims. Allstate knew that it had no intention of paying the full value of policyholder claims, and that Allstate would only pay the predetermined claim value calculated via the McKinsey method without regard to the actual value of the sustained loss. Allstate knew that, if plaintiff challenged the claim decision, Allstate would implement its litigation plan to force plaintiff to accept Allstate's predetermined claim value. Allstate made this representation with the intent that the plaintiff act on it. Allstate knew that the plaintiff was seeking peace of mind, and Allstate made the representation knowing that plaintiff would act on it. The plaintiff purchased the policy, paid all premiums, in reliance on the representation and with the expectation that Allstate would keep its promise. The representation caused injury to plaintiff.

64.    The McKinsey program dictated that Allstate give plaintiff a choice: Accept a settlement now for a fraction of the true cost of plaintiff's damage or expect to spend several years in grueling litigation. McKinsey predicted that ninety percent (90%) of claimants would be forced to

capitulate because the claimants would need the money in a prompt settlement. The plaintiff gave Allstate money for something that the plaintiff could never receive. Allstate sold uncollectible insurance to the plaintiff. With one hand, Allstate sold the plaintiff an insurance policy and promised to protect the plaintiff from financial harm. With the other hand, Allstate used the McKinsey program as a hammer to destroy the protection that Allstate promised to provide.

65.    Allstate lied when it informed plaintiff that the policy did not cover all of plaintiff's damages. Allstate's motivation in telling this lie was to properly execute the McKinsey strategy and thus allocate the entire policy premium to profit. Allstate told this lie to further the original fraud – the selling of an insurance policy to plaintiff that Allstate knew would not function as promised.

66.    Allstate's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

      a.    actual damages;

      b.    exemplary damages; and

      c.    prejudgment interest

### COUNT 4 – FRAUD BY NONDISCLOSURE

67.    Plaintiff incorporates into this count the allegations contained in paragraphs 56 through 66. The CCPR program would govern any claim filed by plaintiff under the policy. As previously described, the purpose of the CCPR program was to increase corporate profits at plaintiff's expense should plaintiff ever file a claim under the policy. Allstate concealed this fact from plaintiff and failed to disclose the facts about the CCPR program to plaintiff. Because the operation of the CCPR program directly contradicted the promises that Allstate made to the plaintiff, Allstate had a duty to disclose these material facts to plaintiff. The defendant knew the plaintiff was ignorant

of the facts and that the plaintiff did not have an equal opportunity to discover the facts.  Allstate was deliberately silent when it had a duty to speak.  By failing to disclose the facts, the defendant intended to induce the plaintiff to purchase the insurance policy.  Plaintiff purchased the policy and thus relied on Allstate's nondisclosure.  Plaintiff was injured when plaintiff acted without the knowledge of the undisclosed facts.

68.    Allstate's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

      a.    actual damages;

      b.    exemplary damages; and

      c.    prejudgment interest.

## COUNT 5 – FRAUD IN SALE OF INSURANCE POLICY

69.    Plaintiff incorporates into this count the allegations contained in paragraphs 56 through 66.  Prior to selling the insurance policy at issue in this lawsuit to plaintiff, Allstate created a claims handling program that would govern the handling of any claim that plaintiff would file under the policy.  Allstate hired McKinsey & Company to redesign the system Allstate uses to handle insurance claims.  McKinsey named the project "Claims Core Process Redesign," or "CCPR."

70.    CCPR had the following stated goals:

      a.    Fuel Growth

      b.    Improve Shareholder Returns

      c.    Expand opportunities and quality of life for employees; and

      d.    Improve Allstate's standing with claimants and customers.

71.    Allstate conducted a "Closed File Review," or "CFR" to identify areas in which the dollar amount of customer claim payments could be reduced.  The CFR identified and addressed

alleged instances of claim "overpayments." However, the CFR did not attempt to measure instances in which Allstate underpaid claims.

    a.    Following Allstate's closed file review of homeowner claims, Allstate determined that its largest opportunity to reduce claim payments existed in Allstate's evaluation of roof damage claims.

72.    Using a reverse-engineering process, Allstate sought to use CCPR to establish a new and reduced fair market value for property damage claims.

    a.    Allstate first created cost reduction and earnings per share goals and objectives that it wanted to accomplish through its use of CCPR.

    b.    Allstate then conducted the Closed File Review to find opportunities to reduce claim values.

    c.    Allstate then implemented the use of claim adjusting software which Allstate could calibrate or "tune" to produce outputs in line with Allstate's financial goals and that produced the sought after reduced claim values.

    d.    Furthermore, because claim values increased when Allstate allowed its claim adjusters to handle claims using their professional judgment and experience, Allstate removed the professional judgment of its adjusters in the handling of homeowner and other claims through Allstate's implementation of CCPR.

    e.    Allstate also employed employee compensation incentives to encourage its employees to embrace CCPR procedures.

    f.    McKinsey's formulation of CCPR did not include input from the market of actual contractors who would be responsible for performing the repairs and services associated the damage claims that Allstate would handle.

g.    Allstate predetermined that the average claim settlement should be the amount established through its artificial evaluation process.

73.    McKinsey then created a method through which Allstate could use the American judicial system as the main driver in CCPR's efforts to enforce acceptance of Allstate's claim values.

a.    Allstate considers the insurance claims process as a "Zero Sum Game" in which someone must lose so that Allstate can "win."

b.    Allstate's stated goal, through its use of CCPR, was to "win by exploiting the economics of the practice of law."

c.    Allstate's stated goal, through its use of CCPR, was to "redefine the game," "change the rules and play a new game," and to achieve "zero-sum game results."

d.    Pursuant to CCPR principles, Allstate used "alligator" claim representatives to handle customer claims.

e.    CCPR directed Allstate's adjusters to adhere to Allstate's artificially created market values and to use litigation to maintain those values.

f.    CCPR directed Allstate employees to implement a "From Good Hands to Boxing Gloves" strategy to enforce acceptance of its claim values. Policyholders who accepted Allstate's CCPR evaluated claim values would receive "Good Hands" treatment. Policyholders who demanded fair payment and refused to accept Allstate's CCPR evaluated claim values would receive "Boxing Gloves" treatment.

g.    "Boxing Gloves" treatment consisted of "take it or leave it" negotiating stands designed to deliberately provoke "significantly higher levels of litigation" over claims.

h.    Allstate employed "alligator" adjusters to prevent aggrieved policyholders from obtaining claim compensation the policyholders felt they justly deserved.

i.    Allstate intentionally used the American judicial system as a tool to enforce the claim values it artificially created that had no relation to the actual value of policyholder claims.

j.    To motivate employees to embrace CCPR, Allstate created aggressive employee performance goals and tied employee compensation to those goals.

74.    Through its use of CCPR, Allstate implemented measures to improve Allstate's standing with its customers and to increase customer satisfaction, but not in the most obvious manner that one would expect.

a.    Allstate's key to successful implementation of CCPR was to reduce or eliminate claimant attorney involvement in claims.  CCPR sought to reduce attorney representation by having its claims representatives make early contact, display empathy, establish rapport with claimants, and to make promises of fair treatment to insureds.  Ensuring that claimants were satisfied with the amount of compensation they received for property damages was not part of Allstate's plan to achieve customer satisfaction.

b.    CCPR sought to shift advantage away from claimants and plaintiff attorneys.

c.    CCPR's success depended on Allstate's efforts to change public policy, advocate for tort reform, modify bad faith laws, and improve procedural rules regarding discovery in litigation.

d.    CCPR expressly advanced the notion that claimants would be better off without attorney representation, even though Allstate's and McKinsey's own research showed that represented claimants received higher net settlements despite attorney fees.

75.    CCPR intentionally restricted Allstate's claim performance measurements to those activities required for Allstate to achieve its desired claim evaluation and earnings per share outcomes.

76.    Allstate handled plaintiffs' claim under the construct, policies, procedures, and goals of the CCPR program created by McKinsey & Company and implemented by Allstate. Allstate, via CCPR, defined the payout the plaintiffs would receive from their claim before the policy was sold and before the covered loss even occurred. Prior to selling the insurance policy to plaintiff, Allstate determined that plaintiff would not be allowed to receive payment on any covered claim plaintiff would file under the policy. Allstate sold uncollectible insurance to plaintiff. Uncollectible insurance is not insurance. If plaintiff had known that such a program would have governed any claim plaintiff would file under the policy, then plaintiff would not have purchased the insurance policy from Allstate.

77.    Allstate's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

      a.    Premium payments;

      b.    exemplary damages; and

      c.    prejudgment interest.

### THE WHO, WHAT, WHEN, AND WHERE

78.    In support of the elements of common law fraud and fraudulent nondisclosure, plaintiff alleges the following:

      a.    **THE WHO:**    John O'Donnell, Susan L. Lees, and Craig Porter

      b.    **THE WHAT:**    First misrepresentation – O'Donnell and Lees represented that Allstate would pay the full cost of all covered losses, less the policy's deductible. O'Donnell and Lees made this representation in writing in the insurance policy that Allstate sold plaintiff.

                  Second Misrepresentation – Craig Porter misrepresented to plaintiff in a claim decision letter that the insurance policy did not provide coverage for plaintiff's losses.

  c. **THE WHEN:** First Misrepresentation – Date of policy inception.

         Second Misrepresentation – December 14, 2020 via a letter written to plaintiff's representative.

  d. **THE WHERE:** Raymond, MS

## JURY DEMAND

79. Plaintiff respectfully requests a trial by jury.

## CONDITIONS PRECEDENT

80. All conditions precedent to plaintiff's claim for relief have been performed or have occurred.

## PRAYER

81. For these reasons, plaintiff asks that plaintiff be awarded a judgment against defendant for the following:

  a. Actual damages.

  b. Prejudgment and postjudgment interest.

  c. Consequential damages.

  d. Court costs.

  e. Attorneys' fees.

  f. Punitive damages.

  g. All other relief to which plaintiff is entitled.

Respectfully submitted,

GULF COAST INSURANCE LAWYERS, P.C.
3233 West Dallas Street, Suite 2101
Houston, Texas 77019
Telephone: (713) 941-9309
Facsimile: (844) 270-0740

DANNY RAY SCOTT
State Bar No. 2401092
danny@gulfcoastinsurancelawyers.com

*Attorney for Plaintiffs*